## Case No. 14,869.
### UNITED STATES v. CORRIE.
[Charleston (S. C.) Daily Courier, April 19, 1860; 1 Brunner, Col. Cas. 686; 23 Law Rep. 145.] [1]

Circuit Court, D. South Carolina. April Term, 1860.

PIRACY — SLAVE TRADE — JURISDICTION — NOLLE PROSEQUI.

[1. Under Act May 15, 1820, §§ 4, 5, declar-ing certain acts by the master and crew of a ves-sel, relative to negroes, piracy, and giving ju-risdiction of the offense to the federal courts of the state in which the offender is "brought" or "found," the mere landing in a state of negroes with intent to sell them as slaves is not piracy, which would be an offence committed within that state, and therefore triable there (under Const. art. 3, § 2, declaring that the trial of crimes shall be in the state where the crimes were com-mitted; but, when not committed within any state. the trial shall be where congress directs); but it is part of such offense that the crew land-ed on a foreign shore, and there seized free negroes with intent to make them slaves, and confined them in the vessel. from which they were landed.]

[2. Leave to enter nolle prosequi in a piracy case pending in a federal court will not be granted. the motion of the United States at-torney therefor not being made in the exercise of his discretion. or for the purpose of abandon-ing a prosecution, for any of the causes which suggest that course, but having been made at the direction of the attorney general of the United States, with the sanction of the presi-dent. for the purpose of overcoming the judg-ment of the court in which the case is pending, that it, and not the federal court of another state, has jurisdiction of the case.]

[Cited in Confiscation Cases, 7 Wall. (74 U. S.) 457.]

[1] [1 Brunner, Col. Cas. 686, and 23 Law Rep. 145, contain only partial reports.]

MAGRATH, District Judge. The question raised in this case is of so much importance that I have considered it proper to set forth the reasons which had led me to the conclu-sion I shall announce. And to the right un-derstanding of the case, it is necessary to give a concise statement of it, from the time when first it was brought before me to the present moment.

The first proceeding in this court against Wm. C. Corrie rested upon an affidavit made by Mr. Ganahl, then the attorney of the Unit-ed States for the district of Georgia, in which it was charged, from "credible information," that William C. Corrie, master or commander of the vessel called Wanderer, did land in the Southern district of Georgia certain negros not held to service by the laws of either of the states or territories of the United States, with intent to make them slaves; and that the said William C. Corrie, master or commander of a vessel called the Wanderer, on a foreign shore, did seize, decoy, and forcibly bring, carry and receive on board the said vessel such negros, landed by him as aforesaid in the Southern district of Georgia, with intent to make them slaves, contrary to the fourth and fifth sections of the act of congress of the 15th May. 1820 [3 Stat. 600]. The affidavit, of course, is more full and circumstantial than this synopsis of it. Upon this affidavit a warrant was ordered to issue for the arrest of the said William C. Corrie, to answer the charge so made against him. At the same time an order was asked for his removal to the state of Georgia, there to be tried for the offence with which he was charged. I considered the question, and re-fused to make the order, because by the ex-press provision of the act of congress of the 15th May, 1820, under which he was char-ged and arrested, jurisdiction of the offence was in the circuit courts of the state in which the offender was "brought" or "found," and the offender having been "found" in the state of South Carolina. It was at the same time declared that the jurisdiction which thus be-came vested in the courts of the United States for the state of South Carolina was exclusive of jurisdiction in the courts of any other state; and application having been made in that be-half, he was admitted to bail, and became bound with sureties to appear and answer the charge against him, at the next ensuing term of the circuit court of the United States for the state of South Carolina. After these pro-ceedings had taken place, and before the term of the circuit court of the United States, for the state of South Carolina, to which the ac-cused had been bound to appear; in the dis-trict court of the United States for the state of Georgia, a true bill was returned to that court. by the grand jury, against Wm. C. Corrie for piracy, under the act of May 15, 1820. An exemplification of it was laid before me, and the motion renewed for the removal of the ac-cused to the state of Georgia for trial. I re-fused again to order the removal, but ordered that the amount of the recognizances in which

he was bound to answer here should be doubled. During the term of the circuit court of the United States for South Carolina, and before the grand jury had been charged in the case against Wm. C. Corrie, a bench warrant was issued against him, out of the courts of the United States in the state of Georgia, for his arrest to answer to the charge of having violated the act of congress of 1818; and again I was applied to for an order directing his removal for trial to the courts of the United States for Georgia. I again refused for several reasons, one of which was, that it was without precedent to ask a court having before it a criminal accused of a capital offence, and whose case the grand jury were in waiting to consider, to send him to another tribunal, there to be tried for a minor offence. Subsequently to this, the case of the U. S. v. Wm. C. Corrie, charging him with piracy under the act of congress of the 15th May, 1820, was submitted to the grand jury, then in attendance upon the circuit court of the United States for the state of South Carolina; and the charge in the case was delivered to the grand jury by Judge Wayne, the associate judge of the supreme court, assigned to this circuit. The grand jury retired, with the witnesses, and returned into court without having found a bill. The next day the foreman of the grand jury asked that the bill against Wm. C. Corrie should be again committed to it. Judge Wayne thought it should not be; I differed in opinion. The grounds of that difference need not be stated here. I adhere to the opinion I then expressed. The grand jury should have been impeached or allowed to reconsider the case; if they desired to do so; for I see no ground upon which they could be refused the exercise of their privilege, unless they had rendered themselves unfit. The grand jury then retired, and came into court with a presentment, charging Wm. C. Corrie with a violation of the act of congress of the 15th May, 1820, and asking the court to make the necessary orders for his prosecution. The grand jury were then discharged. William C. Corrie, who had been by me admitted to bail, had been ordered to be taken by the marshal into his custody. His sureties of course had been discharged. At the close of the term, through his counsel, he applied again to be admitted to bail. Judge Wayne, who was sitting with me, stated that he felt no obligation to change the position in which I had placed the case,—before the term,—when I had admitted the accused to bail; that he did not feel called upon to dissent or commit himself at all upon the question of bail, and left the matter with me. I admitted the accused again to bail. My opinion as to the nature and extent of the power devolved upon me in such cases, in relation to bail, as also in regard to the obligation which the grant of the power carries with it for its exercise, is set forth in the opinion prepared at that time, and on the files of this court. The accused became, thereupon, bound with his sureties,

to appear and answer at the next term of the circuit court of the United States for the state of South Carolina.

At Greenville no proceedings were taken, and the case was postponed to the next term of the circuit court in Columbia. And, at at that term, the attorney for the United States, having read to the court the evidences of all efforts used to obtain the necessary witness, upon his motion, the accused was ordered again to enter into new recognizances to appear and answer at this term of the circuit court of the United States. It is proper to bear in mind that the accused, so far as is known to this court, has never, in the terms of the act of 1820, been "brought" or "found" within the limits of the state of Georgia; it is believed of this there can be no doubt. But he was "found" within the limits of the state of South Carolina. And, as already said, when "found" within the limits of the state of South Carolina, jurisdiction of the offence was vested, by the express provisions of the act of 1820, in the circuit court of the United States for this state. While held subject to the jurisdiction of this court, the grand jury of the United States court in Georgia returned into court a true bill against him for a violation of the same act, which he was here held to answer. In regard to these cases there was a direct conflict of jurisdiction. In the proceedings subsequently adopted against him in the courts of the United States for Georgia, and which related to a violation of an act of 1818 (a minor offence), it never was denied in this court that there was jurisdiction of that offence in the courts of the United States for the state of Georgia.

Nor was it because of a question of jurisdiction that the order for his removal was refused. Two reasons did, however, induce the refusal. The one, stated in the opinion then delivered in this court, already noticed, and which was, that, while held here to answer for a capital offence, he could not be transferred to another court, there to be tried for a misdemeanor. It was in relation to a question similar to that then before the court, but not presented with so many objectionable circumstances, that Chief Justice Marshall said: "Such a thing has never been done; it is contrary to all correct principles." But this sufficient in itself, as it undoubtedly was, did not alone guide me in the decision. I had great reason to believe that the application to remove him, under a charge of having violated the act of 1818, was not intended to secure his presence at the trial of that charge; but that when removed under the charge of having violated the act of 1818, he was to be tried for a violation of the act of 1820—the same offence for which he was held here to answer, and of which it had been decided by this court that it alone had rightful and exclusive jurisdiction. To Judge Wayne all the reasons which led me to refuse the order asked were fully communicated. It is proper to say that Judge Wayne assured me that

he had no knowledge of the purpose for which the removal was asked for. In the statement now made to the court, of the proceedings which are to succeed the entry of the nolle prosequi, it is understood the purpose is now, as it was then; to remove to the courts of the United States in Georgia, under an alleged violation of the act of 1818, but to try him for a violation of the act of 1820. I said then that I would not use the power, with which I was vested, to remove a criminal for any such purpose; and I have not since then, changed my determination. It is obvious that there must be a very wide difference in opinion, between the courts of the United States in Georgia and South Carolina, as to the court having jurisdiction of the offence with which the accused is charged, under the act of 15th May, 1820. And it is proper once again to express the opinion that in the circuit courts of the United States for this state is jurisdiction of the offence, and in such courts must the offender be tried. The place at which the trials of all crimes and offences cognizable in the courts of the United States, under the laws thereof, shall be had, is to be determined, in the first place, by the consideration of the place where the crime or offence was committed. By the third article, third section of the constitution, such trial shall be held in the state where the crime has been committed; but if not committed within any state, the trial shall be at such place or places as congress may, by law, have directed. And in the 6th article of the amendments it is declared, that "in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." It is undoubtedly the duty of a court to suppose that congress, in the exercise of its legislative functions, regards the provisions of the constitution. It is outside of the duty of a court to presume that congress ignorantly or willfully disregards a plain provision of the constitution. It must therefore be conceded that if, in the creation of an offence, congress has declared that the place of its trial shall be such place or places as it was competent to provide for offences only that could be committed outside of the limits of a state, the fact of the designation of such place or places for the trial is equivalent to the declaration that the offences created by the act are only such as may be committed outside of the limits of a state.

In the act of 1820, congress has plainly declared the places in which there shall be jurisdiction of the offences it creates. These places exclude the idea of any of these offences being considered by congress as offences to be committed within the limits of a state. To none other than such offences is the designation of the place of jurisdiction consistent with the constitution. If, then, we regard congress as legislating under the

sanction of the constitution, we must consider the offences created by the act of 1820. because of the place or places at which they are to be tried, as offences committed without the limits of a state. If we insist that the offences, any or all, are to be considered as committed within the limits of a state, then did the congress which passed the act of 1820. either not know the article in the constitution and the amendment to which I have referred; or, knowing them, willfully violate their positive command. In the interpretation of a statute, a cardinal rule instructs us to read it so that all its provisions may be consistently preserved. It is enough, according to this rule, to show that by the interpretation of certain words in one sense, other material words must be rejected which by another construction, may be preserved, to command us to adopt that which preserves every provision of the law. In this act of 1820, the place for the trial of offences is plainly and positively expressed. If such offences are regarded as offences not to be considered as committed within the limits of a state, but outside of such limits, then is the designation of the place for the trial thereof constitutional and operative. But if they are considered as to be committed within the limits of a state, the designation of a place or places for the trial thereof is unconstitutional and inoperative. Is there any room for a court, under such circumstances, to entertain a doubt of the construction which it is bound to adopt? If there is an offence under the act of 1820 which is to be held an offence committed within the limits of a state, then that part of the same act which declares the place or places at which jurisdiction shall be exercised of the offences it creates, must be stricken out, because in such a case it would be unconstitutional. I can very well understand in what manner, if any of the offences created by the act of 1820, should or could occur on land, or within the limits of a state, a court would refuse its cognizance of it; because the act in fixing a place for the trial, had so evidently intended to create an offence not to be committed within the limits of a state; but I cannot understand why with that intention of congress so plainly manifested by the designation of a place for trial, exclusively appropriate for offences not committed within the limits of a state, it should be insisted that offences not intended to be included should be included.

To insist that other offences can be tried under the act of 1820, than such as are cognizable, according to the words of the act, in the circuit court of the United States for the state in which the offender is brought or found, is subversive of a fundamental principle in the construction of any criminal law. It has been sometimes contended, but never permitted by a court, that the intention of a law should give a meaning to its words wider than they generally receive. But I have never known before of a case in which the oper-

ation of a severe criminal law was claimed to be carried further than the plain meaning of the words, and the equally plain intention of the law maker would suggest. It is, of course, manifest, that as the accused in this case has been "found" in the state of South Carolina, by the terms of the act of 1820, it is in the circuit court of the United States for this state that he must be. tried. It is equally manifest, that if tried for this offence under the act of 1820, in the circuit court of the United States for the state of Georgia, within which state he has not been brought nor found, the words of the act which describe the place or places where the trial must be had, are virtually stricken out. We may be benefited by the language of Chief Justice Marshall when a similar proposition was before him. "It would be (says he) carrying construction very far to strike out these words. Their whole effect is to limit the operation which the sentence would have without them, and it is making very free with legislative language to declare them totally useless when they are sensible, and are calculated to have a decided influence on the meaning of the clause." And, in the case from which this extract is taken, we may further learn with what caution Judge Marshall proceeded when he was asked, by construction, to increase the offences which the act of congress then under consideration had enumerated. He admitted the probability of that construction which he was asked to make. "But (said he) probability is not a guide which a court in construing a penal statute can safely take. * * * Congress has not made them punishable, and this court cannot enlarge the statute." In another part of the same opinion, he adds: "The conclusion seems irresistible that congress has not in this section inserted the limitation of place inadvertently, and the distinction which the legislature has taken, must of course be re-, spected by the court." "It is (says he) the legislature, not the court, which is to define a crime and ordain its punishment."

When, therefore, I have claimed that the rightful jurisdiction of the offence with which the accused is charged is in the circuit court of the United States for the state of South Carolina, I do so because the act which creates the offence has so declared it. It was here that he was first arrested. When rightful jurisdiction of the case once vested in the circuit court of the United States for the state of South Carolina, it became exclusive of jurisdiction. elsewhere, and the accused could not be transported to a different district for trial. And when, because of offences charged to have been committed in violation of the act of 1820, jurisdiction was claimed by the circuit court of the United States for Georgia of the offence then before this court, and of the offender held to answer here, it could not maintain its claim while in this court there was jurisdiction. And when the right to the exercise of jurisdiction over the offence was claimed by the circuit court of the United States for the state of Georgia, the offence being a violation of the act of 1820, because it was alleged that the offence was committed within the limits of the state of Georgia, the answer is to be derived from the principles laid down by Chief Justice Marshall. No offence committed under the act of 1820 can be within the limits of a state: the place or places appointed for such trials are applicable exclusively to offences committed without the limits of a state. To construe the act as relating to offences within the limits of a state, is to disregard, in its designation of the place or places for trial, "a distinction which the legislature has taken, and must of course be respected by the court." The designation of a place or places for trial, applicable only to offences which could be committed outside of the limits of a state, is equivalent to the words, if used "without the jurisdiction of any state." The creation by congress, therefore, of an offence not cognizable in courts having jurisdiction of offences committed outside of the limits of a state, but cognizable in courts having jurisdiction of offences committed within the limits of a state, is a matter of which the legislature has been silent. "Congress has not made such punishable, and the court cannot enlarge the statute." It seems to me, therefore, that the circumstance relied on to support a claim for the exercise of jurisdiction in this case by the courts of the United States for the state of Georgia, which is that the violation of the act of 1820 occurred within the limits of the state of Georgia, and therefore must be tried in the courts of that state, is the circumstance which conclusively repels the claim so made for jurisdiction, because an act committed within the limits of the state of Georgia, and cognizable therefore, only in the courts of the United States for that state, is not an offence within the terms of the act of 1820, which relates exclusively to offences cognizable in courts exercising jurisdiction under the act of congress over crimes and offences not committed within the jurisdiction of any state. Cognizance of this offence, therefore, by the courts of the United States for the state of Georgia, because alleged to have been committed within the limits of the state of Georgia, and, therefore, cognizable only in the courts of that state, is not consistent with the plain meaning or obvious intention of the act of 1820. It does not respect a distinction which congress has taken; operates to enlarge a penal statute; makes punishable other offences than such as congress has declared; and this no court can do, according to the judgment of the supreme court. And thus, the alleged locality of the offence, under the act of 1820, upon which jurisdiction is claimed, is the circumstance which, if it does exist, would disprove any right to jurisdiction under the act of 1820, because no such offence is declared by that act. It is proper always to bear in mind,

that in a question of jurisdiction in a court of the United States, the right to exercise that jurisdiction must, in the language of Chief Justice Marshall, in the case of Ex parte Bollman and Swartwout [4 Cranch (8 U. S.) 75], "be given by the written law." "Courts which originate in the common law possess a jurisdiction which must be regulated by the common law until some statute shall change their established principles, but courts which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction."

The great vital principle, that the powers exercised in all or any of the departments, by which the government of the United States is administered, are delegated and specific, applies to the judicial as strongly as to the executive or legislative departments. No court of the United States can take cognizance of a crime or offence, until that charged to be such crime or offence shall have been so declared by the congress of the United States; nor can congress declare it to be a crime or offence, unless authorized by the constitution of the United States so to do? Nor with these sanctions, can a court proceed to the trial of such a crime or offence, unless it shall have been authorized to take cognizance thereof? I have said that the ground upon which jurisdiction is claimed for the courts of the United States in Georgia of itself defeats the claim, because it creates an offence within a locality, inconsistent with the intention and language of congress as they appear in the act of 1820. And I will now proceed to show what are the crimes declared by the act of the 15th May, 1820. This act has been in the statute book for nearly forty years; but as yet no court has been called on to give to it a construction which would show the true nature of the offences which it creates. Whatever hesitancy I might feel in undertaking now to give a construction to this act it is, as it should be, altogether removed by the reflection, that it is proper, nay imperative, as I conceive upon those whose duty it is to expound the law, to declare what this act means.

I consider it, moreover, necessary to do so, because there have been verdicts of acquittal rendered by juries in the case of persons charged with a violation of this act; and such verdicts have been regarded as indicative of a purpose on the part of juries not to enforce its provisions. How far such an opinion has a just foundation, may be seen in the statement which I now make; that no case has been tried in the court of the United States for the state of South Carolina, for alleged violations of the act of 15th May, 1820, in which any other verdict than that which acquitted could have been given consistently with the law and the evidence in such case. I will go farther and say, that had in any of the cases which were tried in the courts of the United States for this state a verdict of guilty been rendered, I do not

believe that any judge of the United States would have hesitated in directing a new trial. And this declaration is warranted by the construction which Judge Story, and after him Judge Woodbury, both judges of the supreme court, have given to the criminal intent by the act itself, made an essential part of the crime which the same act has declared. I am now referring to my own opinion, but I have not any reason to suppose, that, in this respect, there was or is any difference between the judges before whom these cases in the courts of the United States, in this state were tried. I have always thought, and the most careful consideration has strengthened the conviction, that there exists a misapprehension of the act of congress of the 15th May, 1820.

It has been said that by this act of congress the slave trade has been declared piracy. I cannot find in this act anything which sustains that construction; while in the act, and in the other acts distinctly passed for the suppression of the slave trade, everything leads us to reject that conclusion. Offences similar to such as are prohibited by the act of congress of 1820, were declared to be; and punished as offences by the British parliament, when the slave trade itself was legalized by that body. I intend to speak from the act itself. The authority to which I refer for the correctness of the opinion I am expressing, is in the words which congress has used in this declaration of its purpose. It is the legislature, not the court, which is to define a crime and ordain its punishment; and the intention of that legislature is to be found in the words they employ. "To determine that a case is within the intention of a statute, its language must authorize us to say so." And this rule, declared by Chief Justice Marshall, has been affirmed in terms equally explicit by Chief Justice Taney. "The law, as it passed, is the will of the majority of both houses; and the only mode in which that will is spoken is in the act itself; and we must gather their intention from the language there used, comparing it when any ambiguity exists with the laws upon the same subject, and looking, if necessary, to the history of the times in which it passed."

The first thing which strikes attention in the consideration of the act of 1820, is that it does not, in its title, nor in any part of the act, either by way of modification, amendment or repeal, refer to the previously existing slave trade laws, or to the slave trade as the object for which its provisions were intended. In every other act passed for the suppression of the slave trade, the purpose is plainly declared in the title and every section of such act. In the only portions of this act in which the slave trade is mentioned; to the mention of it are added certain other things; which other things, when committed, constitute the offences which the act prohibits. These offences, referring to them,

now only generally, consist of landing on a foreign shore, and there seizing or decoying a negro or mulatto, not held to service by the laws of either of the states or territories of the United States, with intent to make him a slave. And this offence, commencing on a foreign coast, is followed out, in its several stages, as it affects that negro or mulatto, in forcibly bringing, carrying, or receiving him on board of the vessel; there confining and detaining him, with intent to make him a slave; or transferring him to another vessel on the high seas or tide-water, or from on board landing or delivering him on shore, with intent to sell or having sold him as a slave. From a very early period to 1819, various acts had been passed by the congress of the United States in relation to the slave trade, considering it as a trade. As a trade, it has been prohibited under heavy penalties. But while prohibited as a trade, no act of congress had made the seizure and decoying of negros or mulattos on a foreign coast, with the intent to make them slaves, an offence to be tried and punished in its courts. That the slave trade itself, and such acts of violence and spoliation are distinct, is seen, as already stated, in the fact; that in the 23 Geo. III. c. 31, by which the slave trade was legalized, it is, also, provided, that no commander or master of any ship trading to Africa shall, by force or fraud, take on board or carry away from the coast of Africa any native or negro of said country, or commit, or suffer to be committed, any violence on the natives, to the prejudice of the trade. As far back, then, as 1750, force, fraud, or indirect practices, in obtaining possession of the negro, was held so distinct from the slave trade that it was prohibited and punished as injurious to the trade; while the slave trade itself was permitted and legalized. In 1819, congress passed two acts, now requiring our attention. One additional to such as were then of force in relation to the slave trade, the purpose of which is distinctly set forth in its title and in all of its provisions, to be for the suppression of the slave trade. The other act was in regard to a purpose equally clear in its titles and its provisions; it was to protect the commerce of the United States. In the progress of and towards the conclusion of the South American war, privateering had degenerated into piracy, and the depredations committed had been so numerous and daring that it became necessary to legislate for the protection of the commerce of the United States; hence the act of 1819. But the duration of that act was fixed, and consequently, in 1820, if still necessary, it had to be re-enacted. In the house of representatives it was amended, by what are now the fourth and fifth sections of the act; and in this form became a law. Such is a brief narrative of the circumstances connected with the legislation of congress in the act of the 15th May, 1820. For its meaning, we must refer to its language.

I am aware that it has been not unusual to seek for a guide in its interpretation to the report of the committee, which recommended these sections, of the house of representatives. Without any more special reference to this report than in saying that its language is so general as to make it unsafe, if it were legal, to adopt it as a guide, it is necessary to understand that the highest authority compels us to reject it, in the construction of this act. "In expounding (says Chief Justice Taney, in another case) this law, the judgment of the court cannot in any degree be influenced by the construction placed upon it by individual members of congress in the debate which took place on its passage; nor by the reasons assigned by them for supporting or opposing amendments that were offered." And if it shall be said that because the act relates to the offence of seizing or decoying a negro or mulatto, or using such a negro or mulatto in any of the modes prohibited by the act, with the intent to make him or her a slave, that, therefore, it relates to the slave trade, enough has already been said to show that such a proposition involves a confusion in the apprehension of degrees of crime made very manifest in the act of 1820; the slave trade laws of the United States up to the year 1819; the legislation of the British parliament; and the obvious distinction between participation in a trade or traffic, business or commerce, declared unlawful; and acts of force or fraud, spoliation or rapine, in regard to the subject matter of that trade or traffic, business or commerce; which may very well be considered as robbery and piracy. But still more: When congress, in the exercise of a power which it has, if it is pleased to exercise it, shall make the slave trade a piracy, it must do so in terms which refer to it as a trade. To infer that the slave trade is piracy because seizing and decoying on a foreign shore, a negro or mulatto, with intent to make him a slave, is so declared, is not, in my mind, recommended by a rule of reason, or consistent with fact. If we consider now the persons who by the act of 1820 are made liable upon conviction to the punishment it inflicts, we will see, more clearly, how inconsistent it is with the idea of its connection with the slave trade.

No one can be punished under the act of 1820, unless he is of the crew or ship's company. Hence no one on board, although the owner of the negros or mulattos, with which the vessel is laden, can be convicted or punished under its provisions. In all other acts of congress passed for the suppression of the slave trade, all persons are embraced, who by violating these laws, can be made liable for such offences in the courts of the United States. In the act of 1794 the prohibition is directed to a citizen or citizens of the United States, or any other person coming into or residing in the same; and words of the same or like general description in regard to persons who shall be liable to the punishment

imposed, will be found in the several acts down to 1819. It may very well be understood, that such acts were intended for the suppression of the slave trade, when they were directed to all persons upon whom the courts could impose punishment, in cases where they were convicted of its violation. But, with what show of reason is it to be urged that an act is intended for the suppression of the slave trade, as a trade or business, which imposes its penalties only on those persons who may be fairly presumed never able to engage in it as a trade or business? Nor can it be said by the severe penalty visited by the act of 1820, upon the crew or ships company, it was intended to destroy the agencies by which the slave trade could be carried on, and in this manner extinguish the trade. For that construction has been given to the intent, by the act made an essential part of the offence, which relieves the crew of the penalty, unless in cases where they claim and exercise over the negros or mulattos, the control of ownership. Without this evidence, they may be guilty of transporting, which is a misdemeanor, punished by fine and imprisonment; but they cannot be held guilty of piracy, and for it punished by death. If then all persons are exempted from the operation of the act of 1820, except the crew or ship's company; and if the crew or ship's company can never have been considered as the persons for whose benefit the slave trade is carried on, or who are able to engage in it as a trade or business; does it not at once appear almost absurd to consider such an act as intended for the suppression of the slave trade? It would suppress the trade by inculpating only those who never could be found guilty of its violations. But, if we will enquire why is it, that the act of 1820 relates exclusively to the crew or ship's company, and no one else, we will understand the crimes which the act declares. It has been seen that if they are persons never engaged in the slave trade as a trade or traffic, the act is meaningless. But if it is remembered that the crew or ship's company were the persons by whom the lawless acts were committed, which in number and daring had, in 1819, called for the protection to commerce which the most stringent penal legislation could impose; that their depredations had been committed in all places and against every flag; that they had braved the municipal laws of the United States; defrauded its revenues by the establishment of depots on its frontier, whence constant violations of its laws were committed; and among these violations was the unlawful introduction of negros,—it may then be seen that the crew or ship's company were the proper objects to which the penalties of the act were directed; because they were the only persons who would commit the offences which it prohibited. The offences so committed were not violations of the slave trade laws, so far as these laws regard that trade, as a trade, busi-

ness or employment: laws which were then severe, and have not for forty years required an addition to the penalties they then enforced; but those acts of seizing and decoying, of force and fraud, or indirect practices in obtaining possession of free negros and mulattos, and making them slaves; such acts as were, in fact, piracy; which, if committed within the limits of the states having slaves, had been by many, if not all, of those states made felonies; and were by the law of those states, as by those of the United States, punished with death.

A brief reference thus to the act of 1820, *its language and some reference to the history* of the times in which it was passed, and the only persons upon whom its penalties can be imposed, indicate that line of reasoning, which has led me to the conclusion that it is not a part of the slave trade laws of the United States, using that term as it is generally received; as referring to a trade, traffic, business, or employment, in which sense it is used in all of the acts passed expressly for the suppression of the slave trade. And a brief examination of the intent, a material element in the offence under the act of 1820, confirms this view. The intent which the act prohibits is to make a slave of such negro or mulatto. It is peculiar to the act of 1820. What does it mean? If expressed in language different from such as is used in any other act, and if the words used have in themselves a "plain meaning," that meaning they must have. "Where there is no ambiguity, there is no room for construction." It has been said that it matters not in the consideration of an offence under the act of 1820, what may have been on a foreign coast, the condition of the negro or mulatto, whether he *was bond or free*. But *from such a* proposition I dissent altogether. And to me it seems not only a matter of easy demonstration to show that, in regard to the offences created by this act, it is of much consequence under the fourth and fifth sections to determine whether the negro or mulatto was bond or free, but that the act itself plainly teaches by the line of evidence which it prescribes, that the court must have that fact established. It seems to me that a regard to his antecedent condition is indispensably necessary in the consideration of the intent. The intent is to make a slave. Of whom? A negro or mulatto; I omit as unnecessary here all other circumstances; not held to service by the laws of either of the states or territories of the United States. The negative of this servitude is part of the evidence to sustain the prosecution. But why disprove this servitude? Of a negro or mulatto decoyed or seized on the coast of Africa, why negative a servitude by the laws of either the states or territories of the United States? The explanation seems plain. The intent prohibited is to make a slave. To make implies the creation of that condition. Of one already a slave it could never be said of him

who continued his servitude that he had made him a slave. The law may presume a condition of freedom until one of subjection is proved. But no such general presumption could prevail, while in the United States over negros and mulattos there was and is a recognized lawful control and established right of property in them. When, however, that condition of servitude recognized in the United States becomes disproved, then it is competent to proceed upon the presumption that the negro or mulatto charged to have been taken or held in violation of the act of 1820 is free until it is proved that he is not. But if the presumption of freedom, unless it was disproved, might support the charge, and be evidence in the charge of an intent to make that negro or mulatto a slave; so, upon the negation of that presumption, and proof of his servitude at the place from which he was taken, the charge of an intent to make him a slave would be disproved; in the same manner as it would be, in a case where the negro or mulatto was proved to be held in servitude by the laws of a state or territory of the United States. The same reason would in both cases lead to the same conclusion.

Whether the negro or mulatto was held to servitude by the laws of either of the states or territories of the United States, by the laws of Brazil, of Cuba or of Africa, of him it could not be said that there was proof of an intent to make him a slave, if he was already a slave. To purchase on that foreign coast a slave may be by other laws of the United States, passed for the suppression of the slave trade, an offence punishable by fine and imprisonment; but no law has yet said that it is piracy. Now, the intent being as is said to make a slave,—that is, create a servitude which did not exist until it was imposed by him who was charged with its commission,—it will be seen how consistent is such an intent with the offence which the act creates. The whole scope of the act of 1820 in regard to the 4th and 5th sections is not perceived unless the 3d section of the same act is also considered. The 3d, 4th, and 5th sections embrace all the cases in which robbery may be committed; and whether that robbery relates to the rights of property or the rights of persons. As in the 3rd section, whatever may be the subject of property, if stolen, is declared piracy, for which, upon conviction, the offender shall suffer death; so in the 4th and 5th sections, the right of personal freedom is protected; and he who violates it by force or fraud, in whatever stage of the transaction he is detected, is a pirate, and upon conviction will suffer death. Such crimes are piracies, because robberies. Robberies, because, by force, fraud, or indirect practices they deprive the negro or mulatto of his right to freedom; that right to freedom being a presumption upon which the court is to act, when the servitude recognized by the constitution and laws of the United States are proved not to exist in the particular case. But if that presumption is repelled by proof of antecedent servitude, then the intent to make a slave or rob him of his right to freedom cannot be sustained; for he cannot be robbed of that which he did not possess. And the possession of the negro or mulatto under such circumstances would be a violation, according to the circumstances of some of the laws passed for the suppression of the slave trade; but it is not a piracy nor a violation of the act of 1820.

This exposition of my construction of the act of 1820, and of the true nature of the crimes which it declares, has been given in explanation of the opinion I hold as to the jurisdiction which the act confers. ·I have not elaborated nor said more than seemed necessary for the apprehension of that view of the law which I have adopted. But it would not be proper to leave it without applying a few tests, which, perhaps, will serve to show how far the construction which I have given is proper. I have said that the object of the law was to protect in his right to freedom, a negro or mulatto, by force or fraud, taken with the intent to make him a slave. And that every one of the offences mentioned in the 4th and 5th sections, which are but successive stages in the same transaction, relate to the negro or mulatto so taken. If this is not so,—if the several offences as set forth in the 4th and 5th sections [2] relate only to a negro or mu-

---

[2] [The 4th and 5th sections of the act of May 15, 1820 (Act 1820, c. 113; 3 Stat. 600), are as follows:

[Sec. 4. If any citizen of the United States, being of the crew or ship's company of any foreign ship or vessel engaged in the slave-trade, or any person whatever, being of the crew or ship's company of any ship or vessel, owned in the whole or part, or navigated for or in behalf of any citizen or citizens of the United States, shall land, from any such ship or vessel, and, on any foreign shore, seize any negro or mulatto, not held to service or labor by the laws of either of the states or territories of the United States, with intent to make such negro or mulatto a slave, or shall decoy, or forcibly bring, or carry, or shall receive such negro or mulatto on board any such ship or vessel. with intent as aforesaid, such citizen or person shall be adjudged a pirate; and on conviction thereof before the circuit court of the United States for the district wherein he may be brought or found, shall suffer death.

[Sec. 5. If any citizen of the United States, being of the crew or ship's company of any foreign ship or vessel engaged in the slave-trade, or any person whatever, being of the crew or ship's company of any ship or vessel, owned wholly or in part, or navigated for or in behalf of any citizen or citizens of the United States, shall forcibly confine or detain. or aid and abet in forcibly confining or detaining. on board such ship or vessel, any negro or mulatto, not held to service by the laws of either of the states or territories of the United States, with intent to make such negro or mulatto a slave, or shall, on board any such ship or vessel, offer or attempt to sell, as a slave, any negro or mulatto not held to service as aforesaid, or shall, on the high seas, or anywhere on tide-water, transfer or deliver over, to any other ship or vessel, any negro or mulatto,

latto not held to servitude by the laws of either of the states or territories of the United States, and have no reference to the mode in which the possession of such a negro or mulatto was. acquired,—then the master of a vessel who purchases a negro or mulatto in Brazil or Cuba, and lands him upon the shore of the United States, or upon another part of the coast of Brazil or Cuba, with intent to sell him again, is a pirate. If it could be necessary to show that this was not the piracy which the act contemplated, it is but necessary to bear in mind that if a passenger shall land, with intent to sell, one hundred negros or mulattos, purchased by him in Cuba, he is subject to fine and imprisonment. But if the captain of the vessel purchases but one, and lands him with the same intent, he would be considered a pirate and must suffer death. The piracy would then not consist in the wrong done to the negro or mulatto; nor in the landing or selling him; but in the fact that in the latter case it was done by the master or one of the crew of the vessel. Surely the statement of such a consequence would be of itself sufficient to show that the construction which leads to it must be alike irrational and illegal. But the act itself shows that it is not merely landing with intent to sell the negro or mulatto, which is an offence declared by it to be piracy for one of the offences specially described is transferring or delivering over to any other ship or vessel such negro or mulatto, with intent to make him a slave. This. done by the crew or ship's company, or any one or more of them is declared piracy; but it is nowhere declared by the act that anything done on board of the vessel to which the negro or mulatto is transferred is piracy; nor will it do to say that the crime is as much in the vessel to which the negro or mulatto has been transferred, as in that from which he was transferred. The answer is given by Chief Justice Marshall: "It would be dangerous, indeed, to carry the principle that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity or of kindred character with those which are enumerated. If this principle has ever been recognized in expounding criminal law, it has been in cases of considerable imitation, which it would be unsafe to consider as precedents favoring a general rule for other cases." That landing or delivering on shore to which

the act of 1820 relates must be connected with the antecedent circumstances of the case; otherwise. as readily seen, it would. convert mere misdemeanors into crimes of the darkest hue. Under the act of 1820, it is a landing or delivering on shore "from on board any such ship or vessel." What is "such ship or vessel"? It must first be referred to the preceding part of the 5th section, and then understood as the ship or vessel on board of which is confined or detained a negro or mulatto, not held to service by the laws of either of the states or territories of the United States, with intent to make him a slave. The same intent which makes, in the 4th section, the seizure or decoy a piracy; the intent to rob of the right to freedom. But this intent, made essential is seen under certain circumstances, in the 5th section which necessarily connect it with the 4th section, and make the two sections comprise all stages and phases of the same transaction. Whence came this negro or mulatto who, on board of this ship or vessel, is confined or detained, or treated in any of the modes described in this section? I cannot doubt that it is the negro or mulatto of whom unlawful or piratical possession was obtained, in the modes described in the 4th section. Landing or delivering on shore, with intent to sell or having sold, a negro or mulatto, not held to service by the laws of either of the states or territories of the United States, is an offence under the laws of the United States, as it is under the laws of many of the states; but it is not the crime of piracy under the act of the 15th May, 1820. The landing or delivering on shore, which is made piracy under the act of 1820, must be of a negro or mulatto, not held to service by the laws of either of the states or territories of the United States, with intent to sell or having sold him as a slave; . and the ship or vessel from on board of which he is so landed or delivered on shore. is that ship or vessel in which he has been kept forcibly confined and detained with intent to make him a slave; and this intent to make him a slave, is the intent to deprive him of his right of personal liberty, to rob him of his freedom; and such intent can only be affirmed of an antecedent right to freedom. This forcibly confining and detaining on board of such ship or vessel, such negro or mulatto, with such intent, is, although an independent act in itself, yet a stage or condition of the crime, which commenced with the seizure or decoy of the negro or mulatto, on the foreign coast. Landing or delivering on shore, in the 5th section. is connected with antecedent circumstances in the 5th section, all of which are essential in establishing the crimes enumerated in it; and all of which repel the idea of congress, in the creation of these crimes, having intended or considered, that this. or any other of them, was to be regarded as a crime committed within the

not held to service as aforesaid, with intent to make such negro or mulatto a slave. or shall land, or deliver on shore. from on board any such ship or vessel. any such negro or mulatto. with intent to make sale of. or having previously sold, such negro or mulatto as a slave, such citizen or person shall be adjudged a pirate; and on conviction thereof before the circuit court of the United States for the district wherein he shall be brought or found, shall suffer death.]

limits of a state; therefore to be tried in the courts of the United States for that state; and therefore inconsistent with and repugnant to the plain meaning and manifest intention of congress, in its declaration of the place or places where jurisdiction should be exercised in cases under this act. Such is my construction of the act of 1820. I consider it wholly distinct from that portion of the legislation of the states passed for the suppression of the slave trade.

If the act of 1820 is a part of the slave trade legislation of the United States, there are many portions of that legislation, with which it is in conflict, and which, therefore, it must repeal. But no principle which governs a repeal by implication, will sanction it here. It is only by assuming that it is a part of the legislation of the United States, passed for the suppression of the slave trade, that you produce an inconsistency between it and the slave trade laws of the United States. Regarding the various acts passed from 1794 to 1819, as intended for the suppression of trade, traffic, business or employment, in slaves; which is not permitted; and the act of 1820 as intended to suppress acts of piracy, consisting in the unlawful possession of negros, with the intent to make slaves of those, by force or fraud, who are entitled to their freedom; no inconsistency is created between any of these acts. If the most complete evidence should be sought of the difference between legislation which makes the slave trade, as a trade, piracy, and the legislation of congress in the act of 1820, it would be found in a comparison of the act of 1820 with the act of the British parliament, the 9th section of 5 Geo. IV. c. 113, in which the slave trade is made piracy. 5 Geo. IV. c. 113, in the 9th section, plainly sets forth the offence; makes all persons who violate it liable to its penalties; and in the 10th section includes and makes subject to the penalties declared in the 9th section, the captain, mate, surgeon and supercargo, if they know that the vessel is employed or intended so to be, in violation of the act. But the 11th section makes the petty officers, seamen, marines or servants, liable only for a misdemeanor. In another circumstance the difference is still more remarkable. While in the United States, by the most forced construction, it is sought to make the act of 1820 apply to the slave trade as a trade, and extend its penalties to those who cannot be brought within its provisions, the British parliament in 1 Vict. c. 91, abolished the punishment of death, which it enacted in 5 Geo. IV., and substituted therefor other punishment. It declared death as the penalty for being engaged in the slave trade in 1824; it repealed that penalty in 1837. I have already shown that if jurisdiction is claimed in the courts of the United States for Georgia, because, as is said, the crime charged against the accused was committed within the limits of that state, that the statement itself would exclude jurisdiction because the act of 1820 creates no crime which could be committed within the limits of the state.

I have now examined the act, for the purpose of showing, from the nature of the crimes it creates, that they are not such as can be committed within the limits of a state. I come now to the consideration of the motion made in this case to enter a nolle prosequi in the proceedings against William C. Corrie. By the act of congress of 1789, it is directed that there shall be appointed in each district, "a meet person learned in the law to act as attorney for the United States in such district, who shall be sworn or affirmed to the faithful execution of his office; whose duty it shall be to prosecute in such district all delinquents for crimes and offences cognizable under the authority of the United States, and all civil actions in which the United States shall be concerned except before the supreme court in the district in which that court shall be holden." And this law continues to be the source from which this officer derives the knowledge of his duties. The prosecution of offenders is thus made the special duty of this officer. His control over and direction of cases thus committed to his charge is exclusive, until they come under the control of the court. In that stage of the case it becomes subject to judicial power, and this is vested in certain courts, according to article 3, § 1, of the constitution. But although the case may have come under the control of the judicial power, yet, practically, the discretion of the district attorney is exercised in relation to it and its discontinuance, until the trial has commenced, as freely as before. This difference is, however, always recognized, that after it has become subject to judicial control, the district attorney then acts with the express assent or tacit acquiescence of the court.

It would be difficult to describe the relation which the court and the prosecuting officer bear to each other with more exactness than was done by Mr. Taney, now the chief justice, when attorney-general for the United States: "This power (said he, referring to the nolle prosequi) over criminal prosecution has been familiarly exercised by the attorneys for the United States, and also by the attorneys for the several states prosecuting in behalf of the public. It is true that in all such cases, they uniformly act, I believe, with the approbation of the court; but this approbation is commonly asked for by the attorney for his own protection. It is not necessary in order to give him the authority, but it is his justification for the manner in which his authority is used, and since he cannot consult his client (the United States) the sanction of the court is regarded as sufficient evidence that he exercised his power honestly and discreetly. Hence he

invariably asks for it. It is defence to the public, if his conduct in that respect should be impeached; for if any doubts rested in the mind of the court of the fairness and propriety of the measure, they would not suffer the entry to be made." Judge Conklin, after stating the most usual causes for which a nolle prosequi is entered, as laid down by Mr. Chitty, adds: "It is supposed the several district attorneys possess this power. Probably before exercising it, they would in general consider it advisable to state the circumstances of the case informally to the court, for the purpose of obtaining its assent, tacit or expressed, to the propriety of the step." Page 417. And Judge McLeans says it is the undoubted right of the prosecuting attorney before the trial is gone into, under leave of the court, to enter a nolle prosequi on any indictment. Although not so declared by any law, it has been regarded as proper, that the president of the United States should, at least in such public prosecutions as affected the domestic tranquility or foreign relations of the United States, be considered as entitled by his suggestion to the prosecuting officer to justify their abandonment. And this upon consideration of public policy. The president has, it is true, the power to pardon and reprieve; but it is not to this source that the practice must be referred. He swears to take care that the laws shall be faithfully executed. And this binds him to assist in their execution, by all the modes which he can command. But this power, so to speak of it, in the president, in prosecutions where consideration of public policy lead him to interfere by suggesting or directing their abandonment, is not and cannot be enlarged, or confounded with any right, to interfere with the course of legal proceedings; and least of all to exercise it so that it will directly or indirectly overrule the judgment of a court; or change the place at which the trial of a crime or offence shall be had. And, although no one will regard without great respect any suggestion which may come from the president of the United States; yet whenever that suggestion is presented in a form in which it shall interfere with the exercise of judicial power, except in cases of pardon and reprieve, it should not be heeded. It is easy to understand why in public prosecutions which involve domestic tranquility, or the preservation of foreign relations. the opinion of the president of the United States should be potential, if not conclusive, in directing the conduct of the prosecuting officer. But it is so because of the respect paid to the opinions of one occupying that high position, in relation to matters with which he may be presumed to be intimately acquainted; and, therefore, a prosecuting officer may very properly consider that, in the judgment of the president of the United States, a guide is furnished him which he may safely and properly follow. But this is not because

any law of the land so declares it; for if the prosecuting officer shall feel that his duty requires him not to abandon a prosecution, there is no law which forces him to do so; nor would the wish of the president be heard in opposition to his proceeding. After the prosecuting officer had discharged his duty, if conviction followed, the president may reprieve or pardon, remit the forfeiture or release the penalty. The fact that the power of the president to interfere in criminal prosecutions is derived from the obligation to see that the laws are properly executed, and that, in matters which involve internal or external tranquility, his experience may well be regarded as the safest guide, because in these respects of his greater knowledge, shows that, in all cases where there is not involved a question of either internal or external quiet, the reasons which we have seen for such interference with the functions of prosecuting officers wholly cease. Except so far as it may be considered proper, because in all cases, respectful and safe, to give great weight to the suggestions of the president, I doubt the propriety of imposing any higher obligation on the prosecuting officer. For, after all, it is but adding to the prescribed legal duties of that officer, the obligation to obey the directions of the president. Where that direction leads the prosecuting officer to abandon a prosecution, it generally commends itself to our approbation, because it seems an exercise of mercy.

But it should be remembered, that a general power, derived in the manner we have seen, to interfere with public prosecutions, and direct their abandonment, would, in like manner, justify the president in requiring the prosecuting officer to institute and conduct prosecutions. in cases where the judgment of that officer would suggest a contrary course. Such a power existing without the color of law, in derogation of law, so far as it would impose on the prosecuting officer a control unknown to the law, and, by the imposition of that control, extinguish his responsibility to the law, and substitute therefor a dependence on the president, would be in itself so full of mischief, and so much at war with the system of direct responsibility to the country intended to be imposed on all public officers, through the laws which define their duties, that it only requires to be stated. to be fully understood. Of this, however, there can be no doubt. The right of the president to interfere in criminal cases, and cause the abandonment of prosecutions, is exercised only for the purpose of putting an end to such prosecution and discharging the accused. It has never been claimed, never exercised, never permitted, for the purpose of changing the proceedings; still less for the purpose of changing the place of the trial of the accused. So jealous is the law of the United States in this regard, that, as we have seen, it requires the place of trial to

have been previously ascertained by law. And no principle is better established than that where a right to exercise jurisdiction has attached in one place, it excludes jurisdiction in every other place. This principle, declared in the case of Ex parte Bollman and Swartwout, by Chief Justice Marshall, has never been questioned. And if a proceeding operating directly to subvert this principle would find no favor with a court, it would have no better recommendation by tending indirectly to accomplish the same result. It is well to remember that the unquestioned exercise of any power in the course of time is claimed as a right; and precedents, however mischievous, acquire the force of laws. That which in the hands of one ruler, considered as the source of danger, would be regarded as imaginary; in the hands of another as a tyranny is felt to be real. For all the purposes of government, I know not any powers, but such as the law confers; and I know not any administration of these powers but such as the law appoints. Convenience; a proper regard for the opinions of those who have superior opportunities for obtaining information; and confidence in the judgment of those whose position entitles them to it, may well and properly lead one to seek in these guides for his conduct or aids to a conclusion. But with all this, where an officer is created by law, and his functions are declared by law, his ultimate responsibility is to the law.

It will be seen with what pertinency I am led to the consideration of the relations of these officers when in the argument it is said that the attorney of the United States for the state of South Carolina may enter a nolle prosequi without leave of the court; but that his discretion in doing so is controlled by the president. I speak of the president because I am bound to suppose that the directions said to have been given by the attorney-general have the sanction of the president. It is true that the court has no power to command the prosecuting officer to proceed in a criminal case if he is unwilling to do so. It is equally true that when the court permits an entry to be made in its minutes of the entry of a nolle prosequi it adopts and justifies that proceeding. If then, the court cannot refuse its leave to the entry of a nolle prosequi, it cannot refuse its assent or withhold its justification to the prosecuting officer, however desirous or even bound it may be to do so. That to answer all the purposes for which a nolle prosequi is intended, it should be entered in the minutes of the court; that it cannot be entered in these minutes without the assent of a judge; would seem to lead to no other conclusion than that a motion to enter it must be addressed to the discretion of the court. In this case I refuse assent to an entry of it. It is not made in the exercise of that discretion of the attorney of the United States, which is necessary, if not in-dispensable with me, as the evidence of its propriety. It is not made for the purpose either of abandoning a prosecution, for any of the various causes which suggest that course; but to prepare the way for other proceedings, which, in their practical operation, overrule and set aside a judgment of the court. Such a proceeding, operating for such purposes, has nothing to recommend it to me, nor can it have a place in the minutes of this court. I have thus fairly, and I hope plainly, set forth the grounds upon which all of the proceedings in this court have rested. The opinion which I have given as to the true construction of the act of 15th May, 1820, is the same which was by me made known to those who had a right to be informed of it, before this case in which it is now expressed had any existence. When in Columbia, at the term of the United States court, I delivered an opinion upon the general question of the right in congress to declare the slave-trade piracy; it was not intended then to decide that the act of the 15th May, 1820, was the exercise of that right. It was considered proper not at that time, to signify a difference in the court as to the construction of that act. But now the necessity does exist, because the question of jurisdiction involves that of the nature of the offence, and that involves the construction of the act. I think now, as I did then, that congress had the power, but that the power has not been exercised by the act of the 15th May, 1820. If the slave trade, regarding it as a trade or business, is to be declared piracy, the act is yet to be passed by congress. If the power to congress was granted at a time and under circumstances which are so wholly different from the time in which we live and the circumstances which surround us, as to show that the grant of it without restriction was improvident, it is for the states by whom the grant of power was made, to resume it or require modifications of its exercise.